## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FINGERMOTION, INC., <br><br> *Plaintiff,* <br> v. <br><br> CAPYBARA RESEARCH, JOHN DOES 1-10, <br><br> *Defendants,* <br> and, <br><br> WIX.COM, LTD., <br><br> *Nominal Defendant.* | CIVIL ACTION NO. _____ <br><br><br> **COMPLAINT** |

Plaintiff FingerMotion, Inc. ("FNGR" or "Plaintiff"), by and through their undersigned counsel, respectfully states as follows for its Complaint against Defendant Capybara Research ("Capybara" or "Defendant"), John Doe Defendants 1-10 ("Doe Defendant(s)," together with Capybara, the "Capybara Defendants"), and Nominal Defendant Wix.com, Ltd. ("Wix").

### THE PARTIES

1.      Plaintiff FingerMotion, Inc. is a Delaware corporation with its principal place of business and headquarters located at 111 Somerset Road, Level 3, Singapore 238164.

2.      FNGR has an additional office located at 1460 Broadway, New York, New York 10036.

3.      Defendant Capybara Research is a short selling research firm with an unknown principal place of business.

4.      As of the date of filing of this Complaint, the true name(s) and address(es) of the Doe Defendant(s) operating Capybara is unknown.  The Doe Defendant(s) uses the Twitter handle

"@CapybaraShort" as the sole means of identifying himself/herself to the public, but is otherwise anonymous.

5.     Nominal Defendant Wix.com, Ltd. is a website building and hosting platform based in Israel.  Wix's headquarters is located at 40 Namal Tel-Aviv St., Tel Aviv, Israel, 6936025.

6.     Wix operates an office in New York, New York located at 100 Gansevoort St, New York, NY 10014.

7.     Wix is publicly traded on the NASDAQ under the symbol WIX.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because Plaintiff is asserting a claim under the Securities Exchange Act of 1934.

9.     This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

10.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District.

## FACTUAL BACKGROUND

11.     FNGR is a publicly traded mobile services corporation which has stock that can be purchased and sold on the NASDAQ, a stock exchange based in New York City, New York, which is generally regarded as the second largest American stock exchange.

12.     Capybara is a short selling research firm which has been labeled as a "dummy company" with a "dummy website" by internet media outlets, calling Capybara a "'research company' with little to no credibility."  *See* **Exhibit 1**.

13.     The Capybara Defendants operate a Twitter account anonymously under the handle "@CapybaraShort" (the "Capybara Short Account")  The Capybara Short Account was created in July 2023.  *See* **Exhibit 2**.

14.     The Capybara Defendants also operate a website, hosted by Wix, to which Capybara's self-published articles are hosted (the "Capybara Website").[1]

15.     On October 3, 2023, the Capybara Defendants posted a link to Twitter to a "short report" on his/her website titled *FingerMotion: A Serial Case of Stock Promotion That Will End In Shareholder Dilution. $1 Target* (the "Capybara Report").  *See* **Exhibit 3**.

16.     As of October 16, 2023, Capybara's tweet has been viewed by the general public no less than 59,300 times.  *See* **Exhibit 4**.

17.      On October 4, 2023, FNGR issued a press release in response to the Capybara Report (the "Response").  *See* **Exhibit 5.**

18.     In its Response, FNGR states the Capybara Report contains "many errors, unsupported speculations and inaccurate interpretations of events."

19.     As a result of the Capybara Report, internet media outlets have branded FNGR as a "'short and distort' target," significantly impairing FNGR's share value, business opportunities and shareholder's long positions.  *See* **Exhibit 1**.

### *Capybara Operates Anonymously*

20.     The Capybara Defendants have concealed their identity while making their public communications by posting the Capybara Report on its website and anonymous Twitter account.

21.     Both the Capybara Website and Capybara Short Account are devoid of any identifying information, including the name of the author of the Capybara Report and the address

---

[1] The URL of the Capybara Website is https://www.capybararesearch.com/.

Capybara operates from, aside from an email address on the homepage of the Capybara Website (contact@capybararesearch.com).

22.     Capybara's website domain was registered on July 16, 2023 and is currently hosted by Wix.

23.     To register the Capybara Website domain, the Capybara Defendants were required to submit identifying information such as their name, phone number, address, and email address to Wix (together with the Capybara Defendant's Internet protocol address, "the Capybara Defendants' Identity").  *See* **Exhibit 6**.

24.     Plaintiff has exhausted all possible avenues to ascertain the true identity(ies) and address(es) of the Capybara Defendants including an internet search via Google, searching through the Capybara Short Account's posts and replies on Twitter, searching for a contact page on the Capybara Website, searching the U.S. Securities and Exchange Commission's EDGAR database, and searching for information regarding the registration of the Capybara Website's domain.

25.     As such, Plaintiff requires disclosure from Wix of the Capybara Defendants' Identity as this information is unavailable to the public and is in the sole possession of Wix.  *See* **Exhibit 7**.

26.     Without disclosure of the Capybara Defendants' Identity, Plaintiff will be unable to properly name the Capybara Defendants and will be unable to properly serve them.

*The Capybara Report*

27.     The Capybara Report is filled with inaccuracies and misinformation intended to mislead investors and shareholders.

28.     The Capybara Report focuses on FNGR's Form S-3, declared effective on September 29, 2023 (the "Shelf Offering"), $25 million At-The-Market Agreement with Univest

Securities, LLC, dated September 11, 2023 (the "ATM Agreement"), and the company's accounting practices.

29.    First, the Capybara Report alleges that due to a "cash flow problem," FNGR must resort to diluting its stock by executing both the Shelf Offering and the ATM Agreement.

30.    Second, the Capybara Report states FNGR relies on "accounting gimmicks to project strong revenue growth, while the true profitability of the company is quite bleak" and "believe[s] [FNGR] is using accounting practices to report misleading numbers that don't reflect the true economics of the business." *See* **Exhibit 3** at 1-2, 4.

31.    The Capybara Report proceeds to state that it believes FNGR "record[s] the total transaction amount as its revenue even though most of it doesn't remain in its possession." Capybara goes on to admit in its report that "[t]his is a common accounting practice in China" and "there is nothing illegal about this accounting practice." *See* **Exhibit 3** at 4.

32.    Third, the Capybara Report alleges that FNGR is compensating high-profile social media users to promote its stock to increase the price of FNGR shares to financially benefit from the filing of its Shelf Offering and ATM Agreement.

### *FingerMotion, Inc.'s Company Accounting and Financial Reporting*

33.    The Capybara Report delves into FNGR's accounting practices and FNGR's financial reporting.

34.    The Capybara Report claims that FNGR's accounting practices "presents misleading financials that can easily fool unsophisticated investors." **Exhibit 3** at 4. Specifically, the Capybara Report states that FNGR did not properly report accurate and "true" revenue, and instead, utilized accounting practices that are used in China to inflate its revenue in order to appeal to its shareholders and prospective investors. **Exhibit 3** at 4.

35.     Under the generally accepted accounting principles ("GAAP") used in the United States, a company may report any accrued revenues to the company, even though it is not technically in the reporting company's possession.

36.     The Capybara Report claims that reporting rebates on a sale that is not in a company's possession is inappropriate and misleads the public.

37.     Rebates on the sale of a product that is not in a company's possession is a form of accrued revenues, and therefore, under GAAP, FNGR may report the rebates as revenue on its financial statements.

38.     Next, the Capybara Report attempts to explain that a decline in FNGR's gross margins[2] from 2022 to 2023 demonstrates that FNGR will need to "further dilute" its stock to "stay afloat." *See* **Exhibit 3** at 4.

39.     In FNGR's Fiscal Year 2023 report, FNGR outlines each source of revenue, as well as costs of goods sold ("COGS"), and compares its figures to FNGR's Fiscal Year 2022 report.

40.     FNGR's gross margin for Fiscal Year 2022 was 12.27%,[3] where in Fiscal Year 2023, FNGR's gross margin was 6.81%.[4]

41.     FNGR did not conceal, inflate, or underestimate any of its revenue or COGS figures on its Fiscal Year 2022 report and Fiscal Year 2023 reports.

42.     Generally, a "healthy" gross margin falls in the range between 7%-10%.[5] FNGR's gross margin for Fiscal Year 2023 falls just less than one percent of a "healthy" range.

---

[2] Gross margin is a calculation tool used to determine the profitability of a company.  Gross margin is calculated as follows: (revenue - COGS)/ revenue.

[3] ($22,927,415 - $20,113,294) / $22,927,415 = 12.27%.

[4] $34,054,305 - 31,735,735) / $34,054,305 = 6.81%.

[5] *See* Tim Parker, *What's a Good Profit Margin for a New Business*, Investopedia (October 30, 2022), https://www.investopedia.com/articles/personal-finance/093015/whats-good-profit-margin-new-business.asp.

43.     A result of FNGR's decreased gross margin is due to the difference between revenues and COGS being smaller in 2023 than it was in 2022.

44.     FNGR's decreased gross margin does not mean that FNGR has to dilute its stock to "stay afloat," as the Capybara Report suggests.

### Effect of the Shelf Offering and ATM Agreement on Shareholder Dilution

45.     The Capybara Report unambiguously states, "[t]he company's $300 million Shelf Registration and $25 million ATM agreement are likely triggers for significant shareholder dilution." *See* **Exhibit 3** at 1.

46.     On September 11, 2023, FNGR filed its Form S-3 in connection with its Shelf Offering, which contained two prospectuses: 1. The issuance and sale of up to $300,000,000.00 in the aggregate in FNGR common stock; and 2. an ATM Agreement[6] with Univest, where up to $25,000,000.00 of FNGR common stock may be issued and sold through Univest, acting as FNGR's sales agent. *See* **Exhibit 8** at 1.

47.     Generally, the issuance of additional FNGR common shares in the market may result in the reduction of market value for FNGR stock.  FNGR addresses this in its Shelf Offering. *See* **Exhibit 9** at 35.

48.     The Shelf Offering and the ATM agreement does not necessarily mean that FNGR stock dilution is inevitable, nor does it mean that it will have a negative effect on the value of FNGR's stock, as the Capybara Report claims.

49.     The FNGR Shelf Offering and ATM agreement would cause an increase in the interest of prospective and current investors to purchase FNGR common stock, which would result

---

[6] An ATM agreement is an agreement where an issuing company engages an investment bank to allow the issuing company to sell newly-issued shares on the open market up to a specified amount, with the investing bank operating as the sales agent (broker).

in the newly-issued FNGR stock being purchased by buyers in the market.  As a result of the newly-issued stock being purchased, there would be minimal to no stock dilution, as any newly-issued stock would be purchased.

50.    The Shelf Offering and the ATM agreement allows FNGR to gain financing and working capital to fund its intended business plans, which in turn, will raise the value of the FNGR common stock, and result in the reverse dilution of FNGR's common shares.

51.    As the Capybara Report concedes, the ATM agreement will allow FNGR to issue FNGR common shares directly to the open market as a means to raise cash, which would benefit FNGR as a whole.

52.    Due to the effect of the Capybara Report on the market price of FNGR stock, both the Shelf Offering and ATM Agreement have inherently become less valuable and more dilutive as FNGR must now sell more shares of its stock to raise the same amount of capital it would have prior to the release of the Capybara Report.

53.    As such, the Capybara Report and the subsequent short selling of FNGR shares accounts for the decline in FNGR common stock, not FNGR's announcement of the Shelf Offering or the ATM agreement.

### Online Discussion of FingerMotion, Inc.

54.    The Capybara Report alleges that "FingerMotion's stock performance appears to be primarily attributed to extensive stock promotion efforts, rather than substantial underlying developments."  *See* **Exhibit 3** at 1, 6.

55.    Capybara alleges that "a large ring of social media promoters have been hired for coverage and constant promotion of FingerMotion stock" on platforms such as Twitter, YouTube, Discord, emails and more and proceeds to name Twitter and Youtube users who it believes to be

"potential promoters," going so far as to label these people as "part of [the] cult."  Capybara alleges "with no certainty that the above mentioned people are actually receiving compensation by FingerMotion or other parties relating to the active promotion of $FNGR."  *Id.* at 8.

56.     The Capybara Report provides a self-produced chart which visually shows the amount of Tweets posted per day containing the tag "$FNGR," a common tag used by Twitter users when discussing FingerMotion, Inc., between June 10 and June 23, 2023.  This chart shows the amount of Tweets discussing FNGR increases throughout the specified time period.  *Id.* at 10.

57.     On its platform, Twitter shows its users topics that are "trending" based on an algorithm and are determined based on a user's interests, a user's location, and who a user follows.[7] Twitter has a vast user base of retail investors who discuss publicly traded companies on the platform.  Such discussion is commonplace on all social media platforms, including Twitter and YouTube.

58.     Twitter users who engage in discussion of publicly traded companies will have their "trending topics" tailored to their interest in the stock market and securities.  As a topic is engaged with, including discussion about a specific security, the tag the user base uses in their tweets will begin to trend, causing further engagement in the discussion of that specific topic.  This cycle of discussion, the topic trending, and increased engagement in the trending topic happens organically on the platform amongst *all topics*, including specific securities.

59.     Although engagement in the discussion of $FNGR had increased, there is no indication that the engagement in the topic was spearheaded by parties receiving compensation by Plaintiff or any of its affiliates.  In fact, the increase in engagement can be fully explained by the function of Twitter's trending topics.  Fervent discussion of specific securities happens across

---

[7] *See* X, X Trends FAQ, https://help.twitter.com/en/using-x/x-trending-faqs (last accessed October 11, 2023).

countless stock symbols every day, especially when a company files a public disclosure such as a Form S-3, causing those symbols and their respective tags to trend.  $FNGR is no exception.

### The Effect of the Capybara Report on FingerMotion, Inc.'s Market Value

60.     During the week of September 25, 2023, FNGR's share price increased from $5.11 per share on Monday, September 25, 2023 to $6.21 per share at the close of the market on Friday, September 29, 2023.  On October 2, 2023, FNGR's share price continued to rise from $6.26 to $7.00 per share.  *See* **Exhibit 10**.

61.     On October 3, 2023, the date Capybara released the Capybara Report, FNGR opened with a market price of $7.07 per share and closed with a market price of $4.58, a staggering **35.21% decrease**.  *See* **Exhibit 11**.

62.     FNGR has 52.45 million shares outstanding.[8]  As a result of the drop in market price, on October 3, 2023 the market capitalization[9] of FNGR dropped from $370,821,500[10] to $240,221,000,[11] a difference of **$130,600,500**.  To date, FNGR stock has not traded at the same value that the stock opened at on October 3, 2023, $7.07 per share.  By extension, to date FNGR's market capitalization has also not recovered to the same value it had prior to the release of the Capybara Report.

63.     Further, as a result of the Capybara Report, daily short volume in FNGR rose significantly.  During the week of September 25, 2023, the daily short volume ranged from 123,837

---

[8]   *See* Yahoo Finance, FingerMotion, Inc. Share Statistics (last accessed October 10, 2023), https://finance.yahoo.com/quote/FNGR/key-statistics?p=FNGR.

[9] Market capitalization refers to the total dollar market value of a company's outstanding shares of stock or what the public market determines a company is worth.

[10] Market Capitalization = (Outstanding Shares * Market Price) = (52,450,000*$7.07) = $370,821,500

[11] Market Capitalization = (Outstanding Shares * Market Price) = (52,450,000*$4.58) = $240,221,000.

to 553,587 shares shorted.  On October 3, 2023, the daily short volume was nearly double that of the highest short volume trading day of the prior week, 1,164,152 shares shorted.[12]

### *The Capybara Report Interfered with FNGR's Natural Business Expectations*

64.     FNGR expected and anticipated mild volatility in the market value of its common shares upon the filing of its S-3.

65.     FNGR never expected the market value of its common stock to decline by $2.49 per share on October 3, 2023, upon the release of the Capybara Report.

66.     FNGR, and its shareholders, expected only legitimate and natural market forces to impact the value of FNGR's stock.

67.     The Capybara Report was an external, non-natural force that impacted the market value of FNGR.

68.     FNGR did not anticipate the Capybara Report to be released, and certainly did not anticipate the Capybara Report containing falsities, half-truths, and misleading statements that would negatively impact the value of FNGR common stock and prospective business relations.

69.     Upon information and belief, Capybara knew that the Capybara Report would result in the decline in market value of FNGR common stock.

70.     Upon information and belief, it was foreseeable to Capybara that the Capybara Report would result in a decrease in market value of FNGR common stock.

71.     Upon information and belief, Capybara knew that the Capybara Report would harm FNGR's reputation, and therefore, negatively impact FNGR prospective business relations.

72.     But for the Capybara Report, the market value of FNGR's common stock would not have aggressively declined on and after October 3, 2023.

---

[12] Information gathered from FINRA, *Daily Short Sale Volume Files* (last accessed October 10, 2023), https://www.finra.org/finra-data/browse-catalog/short-sale-volume-data/daily-short-sale-volume-files.

73.     Additionally, but for the Capybara Report, the daily short volume of FNGR common stock would not have been as substantial.

### *Capybara Acted Knowingly Published False and Misleading Information in the Capybara Report*

74.     Capybara defamed FNGR by providing false information in the Capybara Report about FNGR's business practices to the general public resulting in damages for FNGR's stock price, market capitalization, and reputation.

75.     Capybara's defamatory statements were published in writing for the public to view. Specifically, the Capybara Report is libel *per se* because the Capybara Report states false facts that tend to injure FNGR concerning its business, trade, and profession.

76.     Capybara acted with actual malice or a reckless disregard for the truth because Capybara knew that the statements contained within the Capybara Report were false at the time of its publishing, and still proceeded to publish the Capybara Report.

77.     As of October 16, 2023, Capybara's tweet has been viewed by the general public no less than 59,300 times.

78.     Capybara falsely stated that FNGR was overstating its income by accounting for rebates in the Capybara Report.  As stated above, revenues generated from rebates is considered an accrued revenue, and therefore, is appropriate to categorize as revenue under United States GAAP.

79.     Additionally, Capybara falsely states that there is "[n]o clear path to profitability" for FNGR.  *See* **Exhibit 3** at 4-5.

80.     Further, Capybara alleges that "a large ring of social media promoters have been hired for coverage and constant promotion of FingerMotion stock" on platforms such as Twitter, YouTube, Discord, emails and more and proceeds to name Twitter and Youtube users who it

believes to be "potential promoters," going so far as to label these people as "part of [the] cult." There is no indication that an increase in engagement in online discussion of FNGR was spearheaded by parties receiving compensation by Plaintiff or any of its affiliates.

81.     Discussion of specific securities happens across countless stock symbols every day, especially when a company files a public disclosure.  Accusing Plaintiff of compensating individuals for discussing a topic common across social media indicates that the Capybara Defendants showed a reckless disregard for the truth of the statements they were making and the ramifications such statements would make.

82.     To this day, the Capybara Report is still up and available for the public to view and read on Twitter.

83.     FNGR is not a public figure.

84.     As a result of Capybara's false statements and misleading information in the Capybara Report, the market value of FNGR stock has sharply declined, injuring FNGR and its shareholders, as well as FNGR's business, trade, and profession.

## FIRST CAUSE OF ACTION

*Securities Fraud*

85.     Plaintiff repeats, reiterates, and re-alleges each and every allegation of the paragraphs as though fully set forth herein.

86.     "It shall be unlawful for any person, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange to effect, alone or with one or more other persons, a manipulative short sale of any security."  15 U.S.C. § 78i(d).

87.     "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national

securities exchange—[t]o effect a short sale, or to use or employ any stop-loss order in connection with the purchase or sale, of any security other than a government security, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(a)(1).

88.     The Capybara Defendants made public communications in an effort to manipulate the general investing public into selling their FNGR shares or into opening short positions in order to capitalize on a drop in share price. This is confirmed by a disclosure in the Capybara Report which states "*[w]e hold a short position in shares of $FNGR....*"  *See* **Exhibit 3** at 1.

89.     The Capybara Defendants acted intentionally to drive down the stock price of FNGR in a manipulative fashion.  Because it held a short position, the Capybara Defendants would financially benefit from a decline in FNGR's stock price.

90.     The foregoing facts give rise to a strong inference that the Capybara Defendants acted with intentionality and recklessness as to how their public communication and the Capybara Report would spread across social media and motivate investors to react by creating short selling downward pressure on FNGR's market price. FNGR's market price has not rebounded to pre-October 3, 2023 levels as the short selling of FNGR stock has increased dramatically.  These short sales are directly caused by the Capybara Report.

91.     Plaintiff's share value, business opportunities and shareholders' long positions in an efficient market relied on to be free of manipulation were artificially manipulated to Plaintiff's detriment, thereby causing Plaintiff damages in an amount to be proven at trial.

92.     As a result, Plaintiff is further entitled to an award of attorney's fees and costs pursuant to 15 U.S.C. § 78u-4(c), to the extent the Capybara Defendants interpose defenses in violation of Fed. R. Civ. P. 11(b).

## SECOND CAUSE OF ACTION

*Tortious Interference with Prospective Business Expectancy*

93.     Plaintiff repeats, reiterates, and re-alleges each and every allegation of the paragraphs as though fully set forth herein.

94.     Plaintiff had and has a valid business expectation that their FNGR stock will only be subject to normal, marketplace, and general business risks of investment.

95.     The Capybara Defendants knew that holders of the stock in FNGR, including the Plaintiff, had an expectation that pure market forces, not false and manipulative public statements, would impact the value of their investments and equity in FNGR.

96.     The Capybara Defendants intentionally and directly caused investors to make a flurry and deluge of short selling trades, putting down pressure on the FNGR stock price.

97.     The Capybara Defendants' conduct disrupted the Plaintiff's expectations of only legitimate market forces impacting the value of its stock.

98.     Further, the Capybara Report had a direct effect on FNGR's Shelf Offering and ATM Agreement.

99.     Due to the effect of the Capybara Report on the market price of FNGR stock, FNGR's Shelf Offering and ATM Agreement have inherently become less valuable and more dilutive than was anticipated.

100.     Plaintiff had a valid business expectation that it would be able to sell its shares of FNGR stock at a higher price or would be able to realize an increased market price.

101.     Due to the decrease in FNGR's stock price, FNGR must now sell more shares of its stock to raise the same amount of capital it would have prior to the release of the Capybara Report, causing more shareholder dilution than it anticipated at the time the Shelf Offering and ATM Agreement were established.

102.    Plaintiff suffered damages as a result of disruption of the business of expectancy.

103.    The Capybara Defendants' conduct was wrongful, because it involved illegal stock market manipulation in violation of federal securities laws quotes above.

104.    Accordingly, Plaintiff is entitled to damages in an amount to be determined at trial.

## THIRD CAUSE OF ACTION

*Defamation*

105.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of the paragraphs as though fully set forth herein.

106.    The Capybara Defendants made malicious and knowingly false assertions of fact—not opinions—tending to harm the reputation, prospects for success and profitability, the legal legitimacy, and character of FNGR.

107.    The assertions of fact constitute libel, and more specifically, libel per se.

108.    The Capybara Defendants have caused damage to FNGR in a direct and proximate fashion for which demonstrable damages have been sustained, as particularly shown by the FNGR market fluctuations and stock prices.

109.    The Capybara Defendants acted with reckless disregard as to the truth or falsity of their assertions.

110.    There is no public figure, public official, or public comment immunity or qualified immunity for the defamatory statements made by the Capybara Defendants.

111.    Upon information and belief, the Capybara Defendants sought to or actually did enrich themselves by injuring FNGR's reputation for the Capybara Defendants' own financial gain or reputational enhancement.

112.    The Capybara Defendants' conduct is over the level of reprehensibility so as to justify the imposition of exemplary and punitive damages in an amount of a proportion to the actual damages thereby caused.

113.    Plaintiff hereby demands a trial by jury and declines to waive the same.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff seeks a Verdict and Judgment against the Capybara Defendants herein as follows:

A.    Awarding Plaintiff compensatory, special, incidental and punitive damages, in an amount to be determined at trial, plus post-judgment interest at the legal rate from the date of the verdict until paid in full;

B.    Awarding attorneys' fees and costs to the extent available under 15 U.S.C. § 78u-4(c), together with post-judgment interest at the legal rate from the date of judgment until paid in full;

C.    Issuing an order directing the Capybara Defendants to publicly retract the Capybara Report in writing;

D.    Issuing an injunction preventing the Capybara Defendants from communicating about FNGR on any social media website or posting articles about FNGR on its website, except for a public written retraction of the Capybara Report;

E.    Issuing an order directing Wix to disclose information which will reveal the true identity of the Capybara Defendants, such as name, address and Internet Protocol address; and

F.    Awarding such other just and/or equitable relief as this Court deems necessary.

DATED: October 19, 2023

Respectfully submitted,

**THE BASILE LAW FIRM P.C.**

_/s/ Mark R. Basile, Esq._
Mark R. Basile, Esq.
390 N. Broadway, Ste. 140
Jericho, NY 11753
Tel.:         (516) 455-1500
Fax:         (631) 498-0748
Email:       mark@thebasilelawfirm.com

_Attorneys for Plaintiff FingerMotion, Inc._